UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

KATHRYN S. HERRICK,

Plaintiff,

v.

NANCY A. BERRYHILL,

Defendant.

Case No. 18-cv-01001-DMR

**ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT**

Re: Dkt. Nos. 21, 22

Plaintiff Kathryn Herrick moves for summary judgment to reverse the Commissioner of the Social Security Administration's (the "Commissioner's") final administrative decision, which found Herrick not disabled and therefore denied her application for benefits under Titles II and XVI of the Social Security Act, 42 U.S.C. § 401 et seq. [Docket No. 21.] The Commissioner cross-moves to affirm. [Docket No. 22.] For the reasons stated below, the court grants the Commissioner's motion and denies Herrick's motion.

## I.    PROCEDURAL HISTORY

Herrick filed an application for Social Security Disability Insurance ("SSDI") benefits on August 20, 2013 and an application for Supplemental Security Income ("SSI") benefits on December 12, 2013. Administrative Record ("A.R.") 198-99, 200-05. She initially alleged a disability onset date of August 1, 2011; however, prior to the hearing before an Administrative Law Judge ("ALJ"), Herrick amended the alleged onset date to December 2, 2013. A.R. 198, 200, 396. Herrick's applications were initially denied on August 27, 2014 and again on reconsideration on November 5, 2014. A.R. 118-23, 126-31. On December 8, 2014, Herrick filed a request for a hearing before an ALJ. A.R. 138-39. Herrick appeared and testified at an August 8, 2016 hearing. A.R. 35-64.

After the hearing, ALJ Evangelina P. Hernandez issued a decision finding Herrick not

disabled.  A.R. 16-34.  The ALJ determined that Herrick has the following severe impairments: affective disorder, personality disorder, bipolar disorder, and attention deficit hyperactivity disorder ("ADHD").  A.R. 21.  The ALJ found that Herrick retains the following residual functional capacity ("RFC"):

> [T]he claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant is limited to simple work as defined in the Dictionary of Occupational Titles as SVP levels 1 and 2, routine and repetitive tasks.  She needs to work in a low stress job as defined as only occasional decision making required and only occasional changes in the work-setting.  She is limited to no interaction with the general public and only occasional interaction with coworkers and supervisors.

A.R. 23.  Relying on the opinion of a vocational expert ("VE") who testified that an individual with such an RFC could perform other jobs existing in the economy, including motor vehicle assembler and cleaner/housekeeper, the ALJ concluded that Herrick is not disabled.  A.R. 28-29.

The Appeals Council denied Herrick's request for review on December 22, 2017.  A.R. 1-6. The ALJ's decision therefore became the Commissioner's final decision.  *Taylor v. Comm'r of Soc. Sec. Admin.*, 659 F.3d 1228, 1231 (9th Cir. 2011).  Herrick then filed suit in this court pursuant to 42 U.S.C. § 405(g).

## II.   THE FIVE-STEP SEQUENTIAL EVALUATION PROCESS

To qualify for disability benefits, a claimant must demonstrate a medically determinable physical or mental impairment that prevents her from engaging in substantial gainful activity[1]  and that is expected to result in death or to last for a continuous period of at least twelve months.  *Reddick v. Chater*, 157 F.3d 715, 721 (9th Cir. 1998) (citing 42 U.S.C. § 423(d)(1)(A)).  The impairment must render the claimant incapable of performing the work she previously performed and incapable of performing any other substantial gainful employment that exists in the national economy.  *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 42 U.S.C. § 423(d)(2)(A)).

To decide if a claimant is entitled to benefits, an ALJ conducts a five-step inquiry.  20 C.F.R. §§ 404.1520, 416.920.  The steps are as follows:

_____

[1] Substantial gainful activity means work that involves doing significant and productive physical or mental duties and is done for pay or profit.  20 C.F.R. §§ 404.1510, 416.910.

2

1.    At the first step, the ALJ considers the claimant's work activity, if any.  If the claimant is doing substantial gainful activity, the ALJ will find that the claimant is not disabled.

2.    At the second step, the ALJ considers the medical severity of the claimant's impairment(s).  If the claimant does not have a severe medically determinable physical or mental impairment that meets the duration requirement in [20 C.F.R.] § 416.909, or a combination of impairments that is severe and meets the duration requirement, the ALJ will find that the claimant is not disabled.

3.    At the third step, the ALJ also considers the medical severity of the claimant's impairment(s).  If the claimant has an impairment(s) that meets or equals one of the listings in 20 C.F.R., Pt. 404, Subpt. P, App. 1 [the "Listings"] and meets the duration requirement, the ALJ will find that the claimant is disabled.

4.    At the fourth step, the ALJ considers an assessment of the claimant's RFC and the claimant's past relevant work.  If the claimant can still do his or her past relevant work, the ALJ will find that the claimant is not disabled.

5.    At the fifth and last step, the ALJ considers the assessment of the claimant's RFC and age, education, and work experience to see if the claimant can make an adjustment to other work.  If the claimant can make an adjustment to other work, the ALJ will find that the claimant is not disabled.  If the claimant cannot make an adjustment to other work, the ALJ will find that the claimant is disabled.

20 C.F.R. § 416.920(a)(4); 20 C.F.R. §§ 404.1520; *Tackett*, 180 F.3d at 1098-99.

## III.    FACTUAL BACKGROUND

### A.    Herrick's Testimony

Herrick testified that "from childhood [she] was quite different" and always had a "ton of energy."  A.R. 42.  She described herself as a "handful."  A.R. 42.  At some point, however, she "started becoming distant from other people" because she did not "know how to get along with them" and did not understand why they were mean.  A.R. 42.  She "couldn't handle social situations" and became "very isolated."  A.R. 43.  She engaged in self-harm cutting behavior when she was young.  A.R. 54.  Herrick graduated from college in 1996, and also obtained a Montessori teaching

degree and a paralegal degree. A.R. 39. She attempted graduate degrees in philosophy twice but did not finish either program because she "wasn't able to turn in papers." A.R. 40. Some years later, she did finish a single course, which "took [her] all." A.R. 40.

Herrick testified that she has held many jobs. She was a child care assistant in 2003 and 2004. A.R. 60. She used to be a substitute teacher but was fired for "trying to be friends with the kids outside of school." A.R. 49. She has also worked in a temporary office job, as a bar waitress, at a burger joint, as a copy editor, and as a paralegal. A.R. 48-49, 58, 60-61. She did some landscaping, and said that she "loved it" and enjoys physical labor. A.R. 57.

Herrick claimed that the reason she cannot work now is because she is depressed and has no energy. A.R. 40. When she does have energy, she tries to regulate her day by taking notes on what she needs to do, such as taking showers and doing laundry. A.R. 40. Herrick identified her one of her main problems as "attention stuff." A.R. 42. "I lose my train of thought. I forget what I was going [sic], what I'm meaning to say," she explained. A.R. 42. Herrick testified that she is often forgetful, such as walking out of her apartment without her keys or other items she needs. A.R. 43-44. She said that she takes extensive notes on a daily basis and has "many systems" to try to organize herself. A.R. 44. She uses three white boards to plan her day and also keeps a time log. A.R. 51. Despite these systems, she has trouble following through and completing tasks. A.R. 52. Although she has been diagnosed with bipolar disorder, Herrick testified that she has not had manic episodes for a while and that mania is her "best regulated symptom." A.R. 46.

On a good day, Herrick tries to shower, stretch, meditate, and take a walk, although she said that she is not sure she has ever completed all of those tasks on the same day. A.R. 41. On a typical date, she gets up, makes coffee, washes her face, brushes her teeth, straightens her hair, gets dressed, and spends time with her cats. A.R. 54. Usually, she gets back in bed and reads the news, browses Facebook, and plays solitaire. A.R. 54. "I'm just trying to exist," she stated. A.R. 54. Herrick said that she is "[n]ormally . . . a very tidy person," but there are times when her laundry piles up and she cannot complete it. A.R. 41. She eats lots of fruit, vegetables, and protein, and cooks on good days. A.R. 45. On bad days, she eats cereal, fruit, and other food that she can keep in her room. A.R. 45. She tries to practice good sleep hygiene and she takes her medicine regularly. A.R. 45.

Herrick testified that, in addition to her depression, she cannot work because she does not get along with people. A.R. 47. She stated that they "take exception to my . . . freedom with my opinions," and described herself as "very judgmental." A.R. 48. "I'm very moralistic and I don't keep that out of my professional life and people get annoyed with me," she explained. A.R. 48. When she works, "[t]hings always seem great at first." A.R. 47. However, she has a "hard time seeing anyone as an authority." A.R. 47. She "hate[s] rules that have no reason" and has a hard time following directions if she disagrees with them. A.R. 48. She rethinks things and does not "ever do anything the same way twice." A.R. 49.

These social issues persist outside of work as Herrick spends most of her time alone. A.R. 50-51, 53. She testified she does not have any friends and does not really have a relationship with her parents, although she is friendly when she sees them. A.R. 53, 55. She has a cousin in the area but she has "too much depression to go over and see him." A.R. 56. She avoids her roommates, to the point that she peeks out of her room to make sure they are not around before she goes to the fridge. A.R. 45. Herrick has tried making friends and going to Meetup groups, but "nothing sticks." A.R. 56. She observed that "[i]t's not very rewarding to be around not depressed people," and that she gets along better with people who are depressed. A.R. 56. However, she said that she enjoys her daily interactions with store clerks. A.R. 56.

## B. Treatment Records

### 1. Sparrow Hospital Records [December 2013]

On December 2, 2013, Herrick was admitted to Sparrow Hospital in Lansing, Michigan. A.R. 406-91. The emergency department notes record that she had just had a stressful experience with a romantic partner in Chicago, after which her parents took her back to their home in Michigan. A.R. 407-08. At her parents' home, Herrick became aggressive. A.R. 408. She threw things and broke several pieces of her parents' property as well as a window. A.R. 408, 413. She picked up a shard of glass and told her providers that she considered suicide but did not cut herself. A.R. 438. She then leaned her head out of a second-floor window to "get fresh air." A.R. 408. Because of Herrick's aggressive behavior, her parents called emergency medical services and the police. A.R. 408. When they arrived, Herrick was banging her head on the sink. A.R. 413. According to the

police report, Herrick assaulted the ambulance driver. A.R. 443. She was taken to Sparrow Hospital's emergency room in an ambulance. A.R. 408, 412, 438.

The emergency room notes record that Herrick was oriented to person, place, and time; was cooperative; and did not appear to be in acute distress. A.R. 409-10. She exhibited impulsive behavior, a short attention span, and impaired insight, but had fair eye contact, logical speech, a stable mood, and adequate judgment. A.R. 417. Herrick was tearful and lethargic on admission. A.R. 438. She told the providers there that she did not have suicidal or homicidal ideations and that she had not attempted to hurt or kill herself. A.R. 408. The prior diagnoses noted include ADHD, bipolar 1 disorder, depression, and insomnia. A.R. 414. The notes reflect that Herrick's parents did not want to take her home at that time because of the possibility that she could become aggressive again. A.R. 410. Herrick was seen talking on the phone with a friend and getting "increasingly aggravated" due to "the loss of the love of her life." A.R. 412. She also stated that she did not want to talk to her parents at that time. A.R. 411. Herrick told the hospital staff that she became angry and aggravated when her parents kept asking her questions about the relationship that ended in Chicago. A.R. 415.

Herrick was transferred to St. Lawrence Hospital on an involuntary psychiatric hold. A.R. 438. The discharge summary noted that Herrick responded well to treatment. A.R. 434. The providers were concerned that her use of Adderall diminished the quality of her sleep, and it appeared that her sleep, cognition, and attention appeared to improve after several days of withholding Adderall. A.R. 434. Without stimulants, she "did not appear to be impulsive, easily distracted or hyperactive." A.R. 439. The treatment regime focused on helping Herrick "gain insight into her relatively poor repertoire of coping skills" and awareness of how to use her strengths to improve her life situation. A.R. 434. The discharge provider noted that Herrick appears to fixate on her diagnoses as a "rationalization for why she continues to stagnate in her progress" instead of as a means to guide treatment. A.R. 434. However, Herrick told providers that she "wouldn't mind a repetitive job," such as on an assembly line, which would "allow her to think while working, and would leave time outside of work for her creative pursuits." A.R. 439. On discharge, Herrick was cooperative, had intact attention and good concentration, good immediate and remote memory, and

fair insight and judgment. A.R. 440. The final diagnoses listed upon discharge were acute stress disorder, bipolar disorder NOS, ADHD, and borderline personality disorder. A.R. 435. She was assessed with a GAF score of 41-50.[2] A.R. 435.

### 2. Alameda County Mental Health Records [December 2013 to February 2014]

On December 18, 2013, Herrick was evaluated by Alameda County Behavioral Health Care Services for psychiatric follow up after her hospitalization. A.R. 492-555. The mental status exam revealed that Herrick had an anxious mood and affect, but had good eye contact, fair insight, and good impulse control and judgment. A.R. 493. She was oriented and alert, and her memory, concentration, and abstract thinking were within normal limits. A.R. 507. Her suicide risk was assessed as low. A.R. 500. The providers discussed possible diagnoses and treatment options and encouraged her to attend DBT classes. A.R. 508. She was assessed with a GAF of 45. A.R. 494, 508.

On January 3, 2014, Herrick appeared for a medication follow up. A.R. 511. She told the

---

[2] "There are five axes in the DSM diagnostic system, each relating to a different aspect of a mental disorder:

Axis I: This is the top-level diagnosis that usually represents the acute symptoms that need treatment; Axis I diagnoses are the most familiar and widely recognized (e.g., major depressive episode, schizophrenic episode, panic attack). Axis I terms are classified according to V-codes by the medical industry (primarily for billing and insurance purposes).

Axis II: This is the assessment of personality disorders and intellectual disabilities. These disorders are usually life-long problems that first arise in childhood.

Axis III: This is the listing of medical and neurological conditions that may influence a psychiatric problem. For example, diabetes might cause extreme fatigue, which may lead to a depressive episode.

Axis IV: This section identifies recent psychosocial stressors—the death of a loved one, divorce, loss of a job, etc.—that may affect the diagnosis, treatment, and prognosis of mental disorders.

Axis V: This section identifies the patient's level of function on a scale of 0–100, where 100 is the highest level of functioning. Known as the Global Assessment of Functioning ("GAF") Scale, it attempts to quantify a patient's ability to function in daily life."

*Cantu v. Colvin*, No. 13-cv-01621-RMW, 2015 WL 1062101, at *6 (N.D. Cal. Mar. 10, 2015); *see also* American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders, 34 (4th ed. 2000) ("DSM–IV") at 27-34. Higher scores correspond with higher ability to function. The DSM-IV been replaced by the DSM-5, which eliminated the multiaxial system of diagnosis.

providers that she was doing well and that her mood had been more stable since the first time she was seen. A.R. 511. She had begun to stabilize her daily routine by waking up early, taking showers, and eating meals. A.R. 511. She expressed a desire to exercise regularly and said that she was working on her journaling. A.R. 511. The notes indicate that she had good hygiene, was wearing appropriate clothing, and had good eye contact. A.R. 511. Her speech was fluent, she had a logical and goal directed thought process, and her mood and affect appeared appropriate. A.R. 511. She was oriented, appeared to have intact memory, and good attention and concentration. A.R. 512. On January 10, 2014, Herrick told providers that she was still feeling sad about her break up but also felt productive. A.R. 516. She stated that she had been talking to her roommates and maintaining a regular regimen of sleeping, eating, and exercise. A.R. 516.

She met with providers again on January 24, 2014. A.R. 524. She reported that she was doing okay and that her mood had been more stable since the first time she was seen. A.R. 524. However, she also stated that she was being less productive again and had not been following through on her routines. A.R. 524. She said she had low energy and had not been wanting to get out of bed. A.R. 524. During the visit, she had good hygiene, good eye contact, fluent speech, a logical thought process, appropriate affect, good mood, good insight and judgment, intact memory, and good attention and concentration. A.R. 525. Office visit notes dated February 13, 2014 again noted normal cognition, memory, and concentration, although Herrick presented with a depressed mood. A.R. 588. Her GAF at that time was assessed at 60-65. A.R. 589-90.

On March 17, 2014, Herrick reported having an encounter with a couple at her residence. A.R. 595. She was upset and threw things, and stated that she was depressed. A.R. 595. A.R. 595. Her mental status exam revealed she was healthy and adequately groomed, was cooperative and calm, and had a euthymic mood and appropriate affect. A.R. 595. Her immediate and remote memory was intact, she had fair attention and concentration, and fair judgment and insight. A.R. 596. Treatment notes from March 27, 2014 record that Herrick was hopeful, and she reported doing "very well since last time." She said that her depression was improving. A.R. 594. A.R. 593. She appeared healthy and adequately groomed and was calm and cooperative. A.R. 593. Her mood was sad/mixed, and she had an appropriate but sad and anxious affect. A.R. 593. Her immediate and

8

remote memory was intact, and she had fair attention and concentration. A.R. 593. These behavioral parameters were almost identical for her next office visit on April 18, 2014. A.R. 592. At that time, she was again observed to be healthy and adequately groomed, was cooperative and calm, and her memory appeared to be intact. A.R. 592. She had fair attention and concentration. A.R. 592.

### 3. LifeLong Medical Care [July 2014 to October 2014]

Herrick appeared for an appointment at LifeLong Medical Care on July 18, 2014. A.R. 602. She was assessed by Brian Whiteside, who is a psychiatric nurse practitioner. Herrick's primary complaint at that time was depression, which manifested as a lack of motivation and energy. A.R. 602. She said that her depression had been slightly improved recently as she had reconnected with the man who had broken up with her the previous year. A.R. 602. She reported that she had taken a DBT class after her hospitalization the previous December, and that she found the class helpful. A.R. 602. NP Whiteside noted that Herrick's appearance was appropriate, she was oriented and had unremarkable behavior, her affect was appropriate, and she had a euthymic mood. A.R. 603. Her memory appeared to be intact and her thought process was logical. A.R. 603. NP Whiteside wrote that he "suspect[s] [Herrick's] attention difficulties are the result of her issues with depression." A.R. 603. The treatment plan included continued medication and therapy, as well as utilizing DBT skills. A.R. 603.

NP Whiteside met with Herrick again on July 28, 2014. A.R. 600. She reported that she was feeling well, although she was a "bit tired" in the morning. A.R. 600. She told NP Whiteside that she had been using her DBT skills, her mood had remained relatively stable, and her appetite was a bit better. A.R. 600. Her mental status exam again showed normal results, as her appearance was normal, her memory was intact, and her judgment and insight were good. A.R. 600. In another follow up office visit on October 9, 2014, Herrick reported feeling very upset due to some recent relationship difficulties with her boyfriend, and that she had been staying in bed for the past few days. A.R. 598. Her mental status exam again revealed normal behavior and appearance, and her mood appeared to be euthymic. A.R. 598.

C.   **Medical Opinions**

1.   **Katherine Wiebe**

On March 20, 2014, Katherine Wiebe, PhD, performed a consultative psychological exam. A.R. 562-80.  She observed that Herrick was "casually dressed and well groomed."  A.R. 567. Herrick was cooperative in the assessment and was oriented to person, time, and place.  A.R. 567, 568.  Her affect was restricted and labile, and her mood shifted from depressed to elevated at times. A.R. 567.  Dr. Wiebe recorded Herrick's behavior as "anxious, tense, and evinced some mood swings."  A.R. 567.  Herrick had good eye contact and showed good effort on tasks.  A.R. 567.  She spoke rapidly and evinced some difficulties in communication, including disjointed recounting of her personal history and anxious "aside comments."  A.R. 567.  Herrick "expressed feelings of guilt and hopelessness."  A.R. 567.  Dr. Wiebe noted that Herrick appeared to be impaired in her judgment, reasoning, and insight concerning her psychiatric problems.  A.R. 568.

Dr. Wiebe administered a battery of tests.  The tests showed that Herrick's IQ is in the above average range.  A.R. 568.  With respect to her attention, concentration, and pace, testing revealed that Herrick's functioning is mildly impaired and falls in the low average range.  A.R. 568. However, Dr. Wiebe noted that Herrick's assessment scores under test conditions "does not necessarily reflect her ability to perform in a work or school situation."  A.R. 568.  Herrick's executive function appeared to be normal.  A.R. 569.  Dr. Wiebe wrote that Herrick likely has mild impairment in her memory, as evidenced by her disjointed recounting of her personal history, but both her immediate memory and delayed memory scored within the average range.  A.R. 569. Herrick's language ability appeared to be mildly impaired, and she scored in the low average range on the Repeatable Battery for the Assessment of Neuropsychological Status ("RBANS").  A.R. 569. She evinced normal visual and spatial abilities and no psychomotor impairments.  A.R. 569-70.

With regard to her emotional functioning, Herrick scored as severely depressed on the Beck Depression Inventory II results.  A.R. 11.  She reported that she feels she is a total failure as a person and cannot get any pleasure from the things she used to enjoy.  A.R. 570.  Dr. Wiebe wrote that Herrick "cries over every little thing, is so restless or agitated that she has to keep moving or doing something, finds it hard to get interested in anything, has trouble making any decisions, and feels

10

more worthless as compared to other people." A.R. 570. Herrick reported irritability, disruption in her sleep, overactive appetite, lack of concentration, excess fatigue, feelings of guilt and worthlessness; and loss of interest in sex. A.R. 570, 572. Herrick's test results also indicated severe anxiety. A.R. 570. Her responses showed that she experiences moderate to severe problems with being unable to relax; feeling terrified and nervous; fearing the worst and fearing loss of control; and having difficulty breathing and digestion issues. A.R. 570. Dr. Wiebe wrote that Herrick endorsed bipolar symptoms, such as having drastic shifts in mood and energy levels from time to time. A.R. 570-71. Herrick told Dr. Wiebe that she had attempted suicide twice in the two weeks prior to the assessment, both times by putting a bag over her head with tape. A.R. 571. She stated that she had another episode similar to the time she was hospitalized where she was "beside herself" and threw and broke things. A.R. 571. Although Herrick reported a few minor physical alterations where she pushed her father and one of her roommates, she denied ever physically hurting anyone else. A.R. 571. Regarding her daily activities, Herrick reported that she is usually able to shop, cook, and clean and now showers "most of the time." A.R. 572. Although she tries to take walks, she manages about one walk a week or less. A.R. 572.

Herrick took the Millon Clinical Multiaxial Inventory ("MCMI") III, an objective test of psychiatric functioning. Dr. Wiebe wrote that the test results indicated that Herrick is experiencing a severe mental disorder. A.R. 572. She said that Herrick's response style "suggests a possible tendency to magnify illness as well as feelings of extreme vulnerability associated with a current episode of acute turmoil." A.R. 572. Dr. Wiebe's interpretation of the results was that Herrick is self-deprecating and unpredictable, and she has an "underlying irritability and discontent." A.R. 573. According to Dr. Wiebe, Herrick's MCMI-III profile indicates "at least a moderate level of pathology [that] characterizes her overall personality organization." A.R. 573. Her abilities to self-regulate and engage in socially acceptable interpersonal conduct appear "deficient or incompetent." A.R. 573. She would "rather withdraw from painful social relationships." A.R. 573. Dr. Wiebe opined that it is likely that Herrick's depression is getting worse. A.R. 573. Even simple responsibilities "may demand more energy than she can muster." A.R. 574.

Dr. Wiebe opined that Herrick would have a difficult time maintaining employment:

> Ms. Herrick would likely experience cognitive and affective difficulties under the pressures of regular job hours and responsibilities, in a regular work environment. She would likely have trouble sustaining required energy, attention/concentration/pace, accurate recall for tasks and directions; and effective communication and organizational abilities, with the pressures of full-time employment. . . . She has difficulties with communication and social interactions that affect her ability to communicate with, and respond appropriately to, supervisors and coworkers. . . . [S]he is vulnerable to decompensation under the stress of a regular work environment.

A.R. 576. She wrote that Herrick's impairments likely make her unable to function in a workplace on a full-time basis for at least the next two years. A.R. 576. She assessed diagnoses of unspecified bipolar and related disorder; borderline personality disorder; and cannabis use disorder. A.R. 576. She noted Herrick's prior diagnosis of ADHD. A.R. 576.

Dr. Wiebe assessed moderate to severe impairments in Herrick's ability to perform activities of daily life ("ADL") and her social functioning skills. A.R. 579. She noted moderate restrictions in Herrick's ability to understand, remember, and carry out both simple and detailed instructions; perform at a consistent pace without an unreasonable number and length of rest periods; get along and work with others; accept instructions and respond appropriately to criticism from supervisors; and maintain regular attendance and be punctual within customary, usually strict tolerances. A.R. 580. Dr. Wiebe also wrote that Herrick has marked impairment in her ability to maintain attention and concentration for two-hour segments; respond appropriately to changes in a routine work setting and deal with normal work stressors; and complete a normal workday and workweek without interruptions from psychologically based symptoms. A.R. 580.

### 2. Matilda St. John

Matilda St. John, psychotherapist, submitted a mental impairment questionnaire dated April 1, 2014 and a supplemental narrative report dated April 17, 2014. A.R. 581-86, 628-32. She has seen Herrick weekly since February 2012. A.R. 626. Ms. St. John wrote that Herrick's "diagnostic picture is a complicated" and that she "presents as much more functional than she actually is." A.R. 629. Ms. St. John wrote that Herrick's main issues are focus/task completion and mood instability/panic, and that her symptoms in both areas are "currently profound." A.R. 629. Ms. St. John opined that Herrick remains "unable to follow through on simple work tasks" and "[h]er

12

struggles are so severe that their im[p]act on her Activities of Daily Living are a constant struggle to overcome." A.R. 630. She also noted that Herrick is "extremely socially isolated" and can go weeks with no social contact. A.R. 630. However, Ms. St. John wrote that Herrick "seems recharged after social contact," which she believes means Herrick is "actually an extrovert whose mental health struggles prevent her from getting some very important social refueling." A.R. 631.

Ms. St. John referred Herrick to a psychiatrist in 2012, who diagnosed her with ADHD and prescribed Adderall. A.R. 630. While Herrick's outlook appeared to improve with medication, Ms. St. John also noted an increase in "worrisome symptoms," such as lack of sleep, more labile moods, and obsessive behavior. A.R. 630. Herrick was then also diagnosed with bipolar disorder and prescribed a mood stabilizer, after which her sleeping habits appeared to become more stable. A.R. 630. After Herrick's psychiatric hospitalization in December 2013, she ceased taking Adderall and began taking Risperidone. A.R. 631. Ms. St. John wrote that Herrick's moods became much more stable with the new medication. A.R. 631.

Ms. St. John opined that Herrick is seriously limited in her ability to remember work-like procedures; maintain regular attendance and be punctual within customary, usually strict tolerances; complete a normal workday and workweek without interruptions from psychologically based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; and work in coordination with or proximity to others without being unduly distracted or distracting them. A.R. 584-85. Ms. St. John also wrote that Herrick would be unable to meet competitive standards in her ability to carry out short, simple instructions; maintain attention for two-hour segments; sustain an ordinary routine without special supervision; and deal with normal work stress. A.R. 584-85. With respect to Herrick's functional limitations, Ms. St. John noted extreme deficiencies of concentration, persistence or pace; marked restriction of activities of daily living; moderate difficulties in maintaining social functioning; and one or two episodes of decompensation within a 12-month period. A.R. 585. Ms. St. John opined that Herrick's "impairments in self-organization, triaging tasks, and task completion are intense." A.R. 585. She stated that Herrick's impairments would cause her to be absent from work more than four days per month, and that she "cannot imagine a work setting that would be able to reasonably accommodate her." A.R. 582, 631.

1  Ms. St. John assessed a GAF of 40. A.R. 581.

2  Ms. St. John also submitted a third-party function report for Herrick on December 16, 2014.

3  A.R. 371-79. Regarding Herrick's mental limitations, Ms. St. John wrote:

> Kathryn experiences profound disruption in her activities of daily life based on her profound disorganization and mood disturbances. She is mostly unable to complete simple tasks because she becomes overwhelmed and distracted by overthinking.

A.R. 371. Herrick's listed impairments include problems with memory, completing tasks, concentration, following instructions, and getting along with others. A.R. 376. Ms. St. John reported that Herrick does not handle stress very well, but that this has improved significantly with Herrick's DBT class. A.R. 377.

Ms. St. John wrote that Herrick struggles with performing basic tasks, such as showering, eating, and housework. A.R. 372-73, 376. Herrick needs reminders to do daily tasks and can become "so engrossed in her own thoughts and lose track of time." A.R. 373. Ms. St. John wrote that Herrick's interests include watching TV, computer games, reading (when her attention span allows it), and arts and crafts. A.R. 375. She also noted that Herrick has had insomnia phases in the past but "sleeps better now." A.R. 372.

With respect to Herrick's social activities, Ms. St. John wrote that Herrick calls and emails her out-of-state boyfriend daily. A.R. 375. She has limited interactions with her housemates. A.R. 375. Herrick told Ms. St. John that she has very occasional interaction with philosophical events and groups, perhaps three or four times per year. A.R. 375. Herrick stated that she has always had trouble holding a job but that the problem has been more profound in the last several years. A.R. 372. She has been fired from jobs due to "conflictual relationships w/ others." A.R. 376. According to Ms. St. John, Herrick "both craves an authority figure and rebels against the idea." A.R. 377. Ms. St. John characterized Herrick as "both compliant and anti-authoritarian," and stated that Herrick has a hard time following any rules that she "doesn't personally see the point of." A.R. 377. Herrick leaves her house two to three times a week as long as her mood is stable; otherwise, she "can go for days barely leaving her room." A.R. 374. When she does go out, she is able to drive herself and does not need to be accompanied. A.R. 374. Ms. St. John acknowledged that Herrick

14

can get herself to therapy and medical appointments regularly.  A.R. 375.

### 3. Brian Whiteside

On May 14, 2015, psychiatric NP Brian Whiteside submitted a mental impairment questionnaire.  A.R. 622.  He wrote that he had been seeing Herrick monthly since July 2014.  A.R. 622.  He noted diagnoses of borderline personality disorder and major depression.  A.R. 622.  NP Whiteside reported that Herrick scored as moderately anxious and depressed on the Generalized Anxiety Disorder ("GAD") 7 and Patient Health Questionnaire ("PHQ") 9 scales.  A.R. 622.

NP Whiteside opined that Herrick has moderate impairments in her ability to sustain an ordinary routine without special supervision; complete a normal workday and workweek without interruptions from psychologically based symptoms; accept instructions and respond appropriately to criticism from supervisors; get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes; and respond appropriately to changes in a routine work setting. A.R. 624. He noted marked limitations in Herrick's ability to maintain regular attendance and be punctual within customary, usually strict tolerances; work in coordination with or proximity to others without being unduly distracted; and deal with normal work stress.  A.R. 624.  NP Whiteside assessed "none-mild" restrictions of activities of daily living; moderate difficulties in maintaining social functioning; moderate deficiencies of concentration, persistence or pace; and four or more episodes of decompensation within a 12-month period.  A.R. 625.  He wrote that Herrick "suffers from severe anxiety & difficulty with relationships."  A.R. 626.   He opined that Herrick's impairments would cause her to be absent from work more than four days per month.  A.R. 622.

### 4. Michael Hipolito

Michael Hipolito, MD, submitted a mental impairment questionnaire on August 3, 2016. A.R. 642-44. He stated that he had seen Herrick quarterly (every 2-3 months since September 2015). A.R. 643.  Dr. Hipolito noted diagnoses of bipolar disorder and borderline personality disorder. A.R. 643.  He wrote that Herrick exhibits a depressed mood, low energy, interpersonal conflict, and poor concentration.  A.R. 643.  He assessed marked limitations in activities of daily living, maintaining social functioning, and maintaining concentration, persistence, or pace.  A.R. 643.  He also reported two episodes of decompensation with a 12-month period.  A.R. 643.  Dr. Hipolito

1  noted that Herrick's prognosis is "good." A.R. 643. He opined that Herrick's impairments would

2  likely cause her to miss more than 4 days per month, and he assessed a GAF of 50. A.R. 643-44.

3  ### 5.  State Agency Medical Consultants

4  State agency medical consultant Patrice G. Solomon, Ph.D., reviewed the records on July

5  24, 2014. A.R. 65-76. Dr. Solomon wrote that there was insufficient evidence to establish a severe

6  mental impairment. A.R. 72-76. On reconsideration, Adrianne Gallucci, Psy.D. confirmed the

7  absence of severe mental impairments. A.R. 91-102.

8  ## IV.  STANDARD OF REVIEW

9  Pursuant to 42 U.S.C. § 405(g), this court has the authority to review a decision by the

10  Commissioner denying a claimant disability benefits. "This court may set aside the Commissioner's

11  denial of disability insurance benefits when the ALJ's findings are based on legal error or are not

12  supported by substantial evidence in the record as a whole." *Tackett v. Apfel*, 180 F.3d 1094, 1097

13  (9th Cir. 1999) (citations omitted). Substantial evidence is evidence within the record that could

14  lead a reasonable mind to accept a conclusion regarding disability status. *See Richardson v. Perales*,

15  402 U.S. 389, 401 (1971). It is more than a mere scintilla, but less than a preponderance. *See Saelee

16  v. Chater*, 94 F.3d 520, 522 (9th Cir.1996) (internal citation omitted). When performing this

17  analysis, the court must "consider the entire record as a whole and may not affirm simply by isolating

18  a specific quantum of supporting evidence." *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th

19  Cir. 2006) (citation and quotation marks omitted).

20  If the evidence reasonably could support two conclusions, the court "may not substitute its

21  judgment for that of the Commissioner" and must affirm the decision. *Jamerson v. Chater*, 112

22  F.3d 1064, 1066 (9th Cir. 1997) (citation omitted). "Finally, the court will not reverse an ALJ's

23  decision for harmless error, which exists when it is clear from the record that the ALJ's error was

24  inconsequential to the ultimate nondisability determination." *Tommasetti v. Astrue*, 533 F.3d 1035,

25  1038 (9th Cir. 2008) (citations and internal quotation marks omitted).

26  ## V.  ISSUES PRESENTED

27  Herrick argues that the ALJ erred at step four in determining her RFC by improperly

28  weighing the medical opinions and rejecting lay testimony. The Commissioner cross-moves to

affirm, arguing that the ALJ's decision is supported by substantial evidence and is free of legal error.

## VI.    DISCUSSION

The ALJ discussed the medical evidence and stated that she gave partial weight to NP

Whiteside's opinion, little weight to Ms. St. John's opinion, and found Dr. Wiebe's opinion "less

persuasive." A.R. 25. She did not state the weight assigned to Dr. Hipolito's opinion, but the court

infers that it was little weight since she discounted that opinion for the same reasons that she

assigned little weight to Ms. St. John's opinion. Herrick argues that the ALJ erred with respect to

the opinions of Dr. Wiebe, Ms. St. John, and Dr. Hipolito.

### A.    Legal Standard

Courts employ a hierarchy of deference to medical opinions based on the relation of the

doctor to the patient. Namely, courts distinguish between three types of physicians: those who treat

the claimant ("treating physicians") and two categories of "nontreating physicians," those who

examine but do not treat the claimant ("examining physicians") and those who neither examine nor

treat the claimant ("non-examining physicians"). *See Lester v. Chater*, 81 F.3d 821, 830 (9th Cir.

1995). A treating physician's opinion is entitled to more weight than an examining physician's

opinion, and an examining physician's opinion is entitled to more weight than a non-examining

physician's opinion. *Id*.

The Social Security Act tasks the ALJ with determining credibility of medical testimony and

resolving conflicting evidence and ambiguities. *Reddick*, 157 F.3d at 722. A treating physician's

opinion, while entitled to more weight, is not necessarily conclusive. *Magallanes v. Bowen*, 881

F.2d 747, 751 (9th Cir. 1989) (citation omitted). To reject the opinion of an uncontradicted treating

physician, an ALJ must provide "clear and convincing reasons." *Lester*, 81 F.3d at 830; *see, e.g.*,

*Roberts v. Shalala*, 66 F.3d 179, 184 (9th Cir. 1995) (affirming rejection of examining

psychologist's functional assessment which conflicted with his own written report and test results);

*see also* 20 C.F.R. § 416.927(d)(2); SSR 96-2p, 1996 WL 374188 (July 2, 1996). If another doctor

contradicts a treating physician, the ALJ must provide "specific and legitimate reasons" supported

by substantial evidence to discount the treating physician's opinion. *Lester*, 81 F.3d at 830. The

ALJ meets this burden "by setting out a detailed and thorough summary of the facts and conflicting

clinical evidence, stating his interpretation thereof, and making findings." *Reddick*, 157 F.3d at 725 (citation omitted). "[B]road and vague" reasons do not suffice. *McAllister v. Sullivan*, 888 F.2d 599, 602 (9th Cir. 1989). This same standard applies to the rejection of an examining physician's opinion as well. *Lester*, 81 F.3d at 830-31. A non-examining physician's opinion alone cannot constitute substantial evidence to reject the opinion of an examining or treating physician, *Pitzer v. Sullivan*, 908 F.2d 502, 506 n.4 (9th Cir. 1990); *Gallant v. Heckler*, 753 F.2d 1450, 1456 (9th Cir. 1984), though a non-examining physician's opinion may be persuasive when supported by other factors. *See Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001) (noting that opinion by "non-examining medical expert . . . may constitute substantial evidence when it is consistent with other independent evidence in the record"); *Magallanes*, 881 F.2d at 751-55 (upholding rejection of treating physician's opinion given contradictory laboratory test results, reports from examining physicians, and testimony from claimant). An ALJ "may reject the opinion of a non-examining physician by reference to specific evidence in the medical record." *Sousa v. Callahan*, 143 F.3d 1240, 1244 (9th Cir. 1998) (citation omitted). An opinion that is more consistent with the record as a whole generally carries more persuasiveness. *See* 20 C.F.R. § 416.927(c)(4).

"Other sources" of evidence, such as social workers, are not considered "acceptable medical sources" under the regulations. *Kelly v. Astrue*, 471 F. App'x 674, 676 (9th Cir. 2012) (citing 20 C.F.R. § 404.1513(a)). Therefore, their opinions are not entitled to the same weight as those of "acceptable medical sources," but are rather reviewed under the same standard used to evaluate lay witness testimony. *Turner v. Comm'r of Soc. Sec.*, 613 F.3d 1217, 1224 (9th Cir. 2010). To discount the opinion of an "other source," the ALJ need only provide "reasons germane to each witness for doing so.'" *Kelly*, 471 F. App'x at 676 (quoting *Turner*, 613 F.3d at 1223-24).

### B. Wiebe Opinion

Dr. Wiebe performed a consultative psychological exam on March 20, 2014. A.R. 562-80. Dr. Wiebe assessed moderate to severe impairments in Herrick's ability to perform activities of daily life ("ADL") and her social functioning skills. A.R. 579. Dr. Wiebe also opined that Herrick has marked impairment in her ability to maintain attention and concentration for two-hour segments; respond appropriately to changes in a routine work setting and deal with normal work stressors; and

1    complete a normal workday and workweek without interruptions from psychologically based

2    symptoms. A.R. 580. She had otherwise moderate limitations in the areas needed to do unskilled

3    work. A.R. 580. Dr. Wiebe stated that Herrick would "likely experience cognitive and affective

4    difficulties under the pressures of regular job hours and responsibilities." A.R. 576. She wrote that

5    Herrick would "have trouble sustaining required energy, attention/concentration/pace; accurate

6    recall for tasks and direction; and effective communication and organizational abilities, with the

7    pressures of full-time employment." A.R. 576. Dr. Wiebe opined that Herrick is "vulnerable to

8    decompensation under the stress of a regular work environment." A.R. 576.

9        The ALJ did not state a specific weight she accorded to Dr. Wiebe's opinion, but wrote that

10   it was "less persuasive." A.R. 25. Because Dr. Wiebe is an "acceptable medical source," the ALJ's

11   reasons for discounting her opinion must be specific and legitimate and supported by substantial

12   evidence. The ALJ gave four reasons: (1) Dr. Wiebe was retained and paid to "generate evidence

13   for the current appeal," (2) her opinion is "without substantial support from the other evidence of

14   record," (3) her conclusions "appear somewhat overly restrictive based on her actual findings," and

15   (4) treatment records show that Herrick began improving after her hospitalization in December

16   2013.

17       With respect to the first reason, the Ninth Circuit has explicitly stated that "[t]he purpose for

18   which medical reports are obtained does not provide a legitimate basis for rejecting them." *Lester*,

19   81 F.3d at 832. In *Lester*, an ALJ rejected an examining psychologist's opinion in part because the

20   psychologist's reports "were clearly obtained by the claimant's attorney for the purpose of

21   litigation." *Id.* The court held that "[a]n examining doctor's findings are entitled to no less weight

22   when the examination is procured by the claimant than when it is obtained by the Commissioner."

23   *Id.*; *see also Ratto v. Secretary*, 839 F.Supp. 1415, 1426 (D.Or.1993) ("The Secretary may not

24   assume that doctors routinely lie in order to help their patients collect disability benefits.").

25       *Burkhart v. Bowen*, 856 F.2d 1135 (9th Cir. 1988), cited by the Commissioner, is inapposite.

26   There, a claimant raised a due process challenge to an ALJ's adverse decision. 856 F.2d at 1139.

27   The ALJ had questioned the credibility of one of the claimant's doctors on the basis that the letter

28   from the doctor had been solicited by the claimant counsel, and the claimant argued that the ALJ's

action denied him of his right to counsel. *Id.* The Ninth Circuit rejected this argument, and held that the ALJ made a "permissible credibility determination given the evidence before [him]." *Id.* at 1339. In that case, the doctor at issue opined that the applicant's vision issues were "untreatable" and that he was incapable of working. *Id.* at 1338. The court noted that the doctor's diagnosis of legal blindness came "without explanation or documentation of any clinical findings." *Id.* at 1337. Further, his opinion was directly contradicted by other doctors who stated that the applicant's vision was improved with glasses and could be "best corrected to 20/20 in each eye." *Id.* Therefore, the evidence in the record provided a basis for the ALJ's adverse credibility finding. The court also noted that the ALJ's comment was not the only reason the ALJ gave for rejecting the doctor's statement. *Id.* at 1339.

The conclusion in *Burkhart* is not inconsistent with the Ninth Circuit's holding in *Lester*. In *Lester*, the court noted that the Secretary "may introduce evidence of actual improprieties." 81 F.3d at 832. In *Burkhart*, for example, the doctor's opinion at issue was that the claimant was legally blind and that his condition was untreatable. 856 F.2d at 1338. The doctor provided no explanation or documentation to support these findings. *Id.* at 1337. Further, the doctor's statements were directly contradicted by other doctors who stated that the claimant's vision could be corrected to 20/20. *Id.* Under such circumstances, the evidence in the record could support a finding of actual impropriety on the part of the doctor. Here, however, the ALJ raised no reasons to question Dr. Wiebe's credibility on the basis that she was retained by Herrick. None of the reasons provided by the ALJ for finding Dr. Wiebe's opinions to be less persuasive suggest impropriety on the part of Dr. Wiebe. Accordingly, the mere fact that Dr. Wiebe was retained by Herrick is not a specific and legitimate reason supported by substantial evidence to discount Dr. Wiebe's opinion. *See Lester*, 81 F.3d at 832.

The ALJ's second reason to discount Dr. Wiebe's opinion is that it is "without substantial support from the other evidence of record." A.R. 25. The ALJ provided no citations to the record in support of this statement, nor did she explain which of Dr. Wiebe's findings were not supported. It is not possible to infer from context which portions of Dr. Wiebe's opinion the ALJ found to be inconsistent with the record and on what basis, and therefore this is not a specific and legitimate

reason to discount Dr. Wiebe's opinion. *See McAllister*, 888 F.2d at 602 (finding that "broad and vague" reasons do not suffice).

The ALJ also discounted Dr. Wiebe's opinion on the basis that her conclusions "appear somewhat overly restrictive based on her actual findings." A.R. 25. For example, the Commissioner points out that Dr. Wiebe's own testing revealed that Herrick has "mild" impairment in attention, concentration, and pace, but Dr. Wiebe assessed a "marked" limitation in her ability to maintain attention and concentration for two-hour segments. A.R. 568, 580. Dr. Wiebe does not reconcile these statements other than to hypothesize that Herrick's assessment scores under test conditions "does not necessarily reflect her ability to perform in a work or school situation." A.R. 568. In fact, Dr. Wiebe's testing revealed largely normal results in most areas, including above average intelligence, normal executive function, average immediate and delayed memory, and mildly impaired language ability. A.R. 568-69. In the context of these test results, Dr. Wiebe's assessment of moderate and marked restrictions in Herrick's RFC may be "overly restrictive based on her actual findings," as noted by the ALJ. A.R. 25. *See Buck v. Berryhill*, 869 F.3d 1040, 1050 (9th Cir. 2017). ("A physician's opinion can be discredited based on contradictions between the opinion and the physician's own notes."). Accordingly, the ALJ provided a specific and legitimate reason to discount Dr. Wiebe's opinion.

The ALJ's final reason for giving less credit to Dr. Wiebe's opinion is that Herrick's treatment records show improvement of her mental functioning after Herrick's hospitalization in December 2013. A.R. 25. "[I]t is error for an ALJ to pick out a few isolated instances of improvement over a period of months or years and to treat them as a basis for concluding a claimant is capable of working." *Garrison v. Colvin*, 759 F.3d 995, 1017 (9th Cir. 2014). In *Holohan v. Massanari*, 246 F.3d 1195 (9th Cir. 2001), for example, the Ninth Circuit found that the ALJ erred in rejecting a physician's opinion because the ALJ was "selective in his reliance on [the] treatment notes," and cherry picked a few "hopeful comments" without reading those statements in context of the "overall diagnostic picture." *Id.* at 1205. This is not the case here. Herrick provided treatment notes through October 2014, which largely recorded improvement from her condition in December 2013. On January 3, 2014, Herrick told providers that she was doing well and that her mood had

been more stable since the first time she was seen.  A.R. 511.  She repeated that she was more stable on January 24, 2014.  A.R. 524.  On March 27, 2014, Herrick's provider noted that she seemed hopeful and that she reported doing "very well."  A.R. 594.  On July 18, 2014, Herrick told NP Whiteside that her depression had improved recently.  A.R. 602.  There was an isolated incident on March 17, 2014, where Herrick presented as upset following a confrontation with a couple at her residence, but the treatment notes in the record substantially support the ALJ's conclusion that Herrick's condition improved after December 2013.  Further, Herrick's mental status exams during all of these visits were largely normal.  A.R. 512, 525, 592-93, 595, 598-600, 602-03.

In sum, the ALJ provided two specific and legitimate reasons to discount Dr. Wiebe's opinion that Herrick's limitations prevent her from working, and accordingly did not err in assigning her opinion less weight.

## C.    St. John Opinion

Ms. St. John submitted a mental impairment questionnaire dated April 1, 2014, a supplemental narrative reported dated April 17, 2014, and a third-party function report dated December 16, 2014.  A.R. 371-79, 581-86, 628-32.  She wrote that Herrick's main issues are focus/task completion and mood instability/panic, and that her symptoms in both areas are "currently profound."  A.R. 629.  She opined that Herrick has extreme deficiencies of concentration, persistence or pace; marked restrictions of activities of daily living; moderate difficulties in maintaining social functioning; and one or two episodes of decompensation within a 12-month period.  A.R. 585.  Ms. St. John stated that Herrick's impairments would cause her to be absent from work more than four days per month, and that she "cannot imagine a work setting that would be able to reasonably accommodate her."  A.R. 582, 631.  She assessed a GAF of 40, indicating "severe" limitations.  A.R. 581.

The ALJ gave three reasons for assigning little weight to Ms. St. John's opinion.  First, with respect to Herrick's deficiencies of concentration, persistence or pace, the ALJ noted that she was "able to complete a long evaluation . . . and exhibited more than average intelligence and only mild limitations in concentration persistence and pace."  A.R. 26.  Second, regarding Ms. St. John's opinion that Herrick is markedly limited in activities of daily living, the ALJ wrote that "the

claimant's record shows that she is able to take care of her personal hygiene and grooming . . . . [and] treatment providers generally noted a normal and adequately groomed appearance." A.R. 26. Third, the ALJ noted that Herrick lives with roommates and attends philosophy conferences after her alleged onset date, which "further contradict[s] the marked limitations in social functioning and concentration persistence and pace." A.R. 26. Because Ms. St. John is an "other" source, the ALJ was required to give "germane" reasons to reject her opinion. *Kelly*, 471 F. App'x at 676.

The court finds that the ALJ met this standard. Regarding Herrick's limitations with respect to concentration, persistence, and pace, objective testing performed by Dr. Wiebe showed only mild impairment in this area. A.R. 569. The ALJ specifically cited these results in discounting Ms. St. John's opinion. A.R. 26. This is the only objective test in the record regarding Herrick's concentration, persistence, and pace, and so the contradicting results are a germane reason to discount Ms. St. John's opinion on this basis. The ALJ's reasoning that Herrick sat through a long evaluation and intellectual functioning tests is perhaps less convincing, because it is a one-time occurrence that does not necessarily reflect on Herrick's overall abilities; however, since the ALJ provided at least one germane reason to discount Ms. St. John's opinion about Herrick's concentration, the court does not find error on this basis. Further, Herrick's mental status exams largely show normal concentration. A.R. 512, 525, 592-93, 595. Accordingly, the ALJ's reason is supported by substantial evidence in the record.

With respect to Herrick's activities of daily life, for which Ms. St. John also assessed a marked limitation, the ALJ pointed out that she is able to take care of her personal hygiene and grooming, and that notes from her providers generally record a normal appearance. A.R. 26. Although hygiene and grooming are not the only relevant activities of daily living, other evidence in the record shows that Herrick is able to drive herself places, go shopping on her own, make appointments, and feed herself. A.R. 45, 374-75, 567, 572. Herrick's only argument that this reason is not germane is that the records do not support "a reasonable inference that Plaintiff is capable of adequately grooming herself day in and day out consistent with a work setting." Pltf. Mot. at 15. However, Herrick does not cite any caselaw in support of this proposition, nor does it align with the treatment notes that consistently note Herrick's appropriate grooming and hygiene. A.R. 512, 525,

23

592-93, 595.

As for Ms. St. John's assessment of Herrick's social functioning, the court finds that the ALJ did not offer germane reasons to discount Ms. St. John's opinion on this point. The two stated reasons are that Herrick lives with roommates and attends philosophy conferences. There is nothing in the record that shows that living with roommates is Herrick's preference rather than a financial necessity. The record does note, however, that she stays in her room much of the time and has only limited interactions with her roommates. A.R. 45, 374-75, 630. Further, the Commissioner concedes that the ALJ misstated that Herrick attended philosophy conferences after her alleged onset date of December 2, 2013. Def. Mot. at 10. Accordingly, the ALJ did not offer germane reasons to discount Ms. St. John's opinion on Herrick's social functioning.

"Even when the ALJ commits legal error, we uphold the decision where that error is harmless." *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1099 (9th Cir. 2014). "We have long recognized that harmless error principles apply in the Social Security Act context." *Molina v. Astrue*, 674 F.3d 1104, 1115 (9th Cir. 2012). An error is harmless if it is "inconsequential to the ultimate nondisability determination," *id.* (internal quotation marks omitted), or "if the agency's path may reasonably be discerned," even if the agency "explains its decision with less than ideal clarity," *Alaska Dep't of Envtl. Conserv. v. EPA,* 540 U.S. 461, 497 (2004) (internal quotation marks omitted).

Here, the court finds that the ALJ's failure to provide germane reasons to discount Ms. St. John's opinion on Herrick's social functioning is harmless error. In determining Herrick's RFC, the ALJ stated that she is "limited to no interaction with the general public and only occasional interaction with coworkers and supervisors." A.R. 23. These restrictive limitations appear to account for the evidence in the record that Herricks has difficulties in social interactions. Herrick does not explain why these RFC are insufficient to account for her limitations in this area.

In sum, the court concludes that the ALJ did not err in assigning little weight to Ms. St. John's opinions regarding Herrick's activities of daily living and her concentration, persistence, and pace. Although the ALJ erred in discounting Ms. St. John's opinion on Herrick's social functioning, the court holds that the error is harmless.

### D. Hipolito Opinion

Dr. Hipolito provided a mental impairment questionnaire dated August 3, 2016. A.R. 642-44. Like Ms. St. John, he assessed marked limitations in activities of daily living, maintaining social functioning, and maintaining concentration, persistence, or pace. A.R. 643. He also opined that Herrick's impairments would likely cause her to miss more than 4 days per month. A.R. 643. Since Dr. Hipolito is an acceptable medical source, the ALJ was required to provide "specific and legitimate reasons supported by substantial evidence" in order to discount his opinion.

The ALJ found that the marked limitations are not supported by the weight of the evidence "for the same reasons offered above," in reference to Ms. St. John's opinion. A.R. 26. As detailed above, the ALJ pointed to specific evidence in the record that does not support marked limitations in Herrick's ADLs or her concentration, persistence, and pace. For example, these results are inconsistent with Herrick's objective test scores and generally unremarkable mental status exams. These are specific and legitimate reasons supported by substantial evidence to reject Dr. Hipolito's opinion as to these limitations. However, the ALJ's reason for discounting Dr. Hipolito's opinion on Herrick's social functioning is insufficient for the reasons discussed above. But since the RFC assessed by the ALJ are consistent with the evidence of Herrick's limitations in this area, the ALJ's error is harmless.

Accordingly, the ALJ did not err in assessing Hipolito's opinion.

## VII. CONCLUSION

For the reasons stated above, the court holds that the ALJ did not err in weighing the medical evidence. Herrick's motion is denied and the Commissioner's cross-motion is granted. The Clerk shall enter judgment against Herrick and close the file in this case.

**IT IS SO ORDERED.**

Dated: September 25, 2019



Donna M. Ryu
Judge Donna M. Ryu
United States Magistrate Judge